137 P.2d 312

NEELEY v. UNION POTASH & CHEMICAL CO. et al.

No. 4701.

Supreme Court of New Mexico.

April 12, 1943.

On Motion to Modify May 22, 1943.

G. L. Reese, Jr., of Carlsbad, for appellant.

Stagner & Anderson, of Carlsbad, for appellee London Guarantee & Accident Co., Ltd.

Caswell S. Neal, of Carlsbad, for appellee Union Potash & Chemical Co.

MABRY, Justice.

There is involved in this case, primarily, the question of whether appellees, as employer and insurer respectively, have become liable because of a violation of the safety appliance statute hereinafter set out, a part of the Workmen's Compensation Act.

Appellant Neeley, as the surviving widow, sued to recover for the death of her husband, Marcus Neeley, who received injuries through accident in the course of his employment as a workman employed by appellee Union Potash and Chemical Company, appellee London Guarantee and Accident Company, Ltd., being the insurer. The said parties will hereinafter be referred to as "appellant", "employer", and "insurer", respectively.

Appellant's deceased, a machinist's helper, was electrocuted while repairing and overhauling a concrete mixer powered with a four hundred and forty volt "ungrounded" motor and machine, used on the surface of the mine properties. Judgment was for appellant for $18 per week for the statutory period, based upon what she claims was the statutory per cent of the average weekly earning of deceased, and taking into consideration the interests of an unborn child of plaintiff and deceased, about which question we shall hereafter speak in discussing the cross-appeal of the employer and insurer. The cross-appeal is taken from that portion of the judgment fixing the weekly compensation at $18. The trial court refused to invoke the 50% penalty provision, and it is from this portion of the judgment only that plaintiff appeals.

Separate answers were filed by the appellee company and the insurer, but the defenses offered to the claim are substantially the same. The employment, the accidental injury, the dependency of the widow, and death are admitted, and, it is likewise admitted that the accident occurred in the course of deceased's employment, and that appellees were liable for the regular statutory schedule allowance for such employee, who appellant contends and the court found (but this is denied by appellees), was earning at the time approximately $40.67 per week; but appellees deny that the circumstances under which the accident occurred calls for the 50% penalty provided by the safety device portion of the statute.

The penalty provision of the act (§ 156-107, 1938 Sup.N.M.Stat.Ann., 1929 Comp., § 57-907, 1941 Comp.) provides: "In case an injury to, or death of a workman results from his failure to observe a statutory regulation appertaining to the safe conduct of his employment, or from his failure to use a safety device provided by his employer, then the compensation otherwise payable under this act (§§ 57-901—57-931) shall be reduced by fifty per centum (50%). In case an injury to, or death of,

a workman results from the failure of the employer to provide the safety devices required by law, or in any industry in which safety devices are not provided by statute, if an injury to, or death of, a workman results from the negligence of the employer in failing to supply reasonable safety devices in general use for the use or protection of the workman, then the compensation otherwise payable under this act (§§ 57-901—57-931) shall be increased by fifty per centum (50%). Provided further, that any additional liability resulting from any such negligence on the part of the employer shall be recoverable from the employer only and not from the insurer, guarantor or sureties of said employer under this act (§§ 57-901—57-931) except that this shall not be construed to prohibit employers from insuring against such additional liability."

The findings of fact pertinent to the question of the average weekly earnings, and the application of the penalty doctrine, are as follows:

"2. On the 28th day of May, 1941, Marcus Neeley, the deceased husband of the plaintiff, was employed by Union Potash and Chemical Company at its plant in Eddy County, New Mexico, as a machinist's helper. The regular wage then being received by Marcus Neeley was $.81 per hour for an eight-hour day and his regular working week was five days per week. In addition to said $.81 per hour wage, said decedent was receiving as a part of his wages the sum of $.26 per day for transportation from Carlsbad, New Mexico·to the mine and plant of said defendant. Said decedent had been regularly employed by said defendant for more than one year prior to May 28, 1941 at an hourly rate ranging from $.64 to $.81 but said $.81 hourly wage had prevailed since February 22, 1941. In addition to the regular working week of five days, said decedent during the course of his employment worked overtime and in the nature of said defendant's business, it was a necessary and expected incident of the employment that said decedent would work overtime when his services were needed by his said employer. The average weekly earnings of said decedent for the period of one year immediately preceding May 28, 1941, were the sum of $40.32 per week, which amount is arrived at by adding the total wages received by said decedent for said period of one year and dividing the same by 52.

3. In view of the character of employment of the defendant and the necessary incidents of said employment which contemplated the working of overtime, the Court finds that it is fair and equitable that the average weekly wage of said decedent be computed by ascertaining his total earnings for the period of one year immediately preceding May 28, 1941, and dividing the same by 52, and that it would be unjust to determine said average weekly wage without taking into account amounts earned by said decedent while he was working overtime.

4. On the said 28th day of May, 1941, the said Marcus Neeley, acting in the course of his employment, was engaged,

with other employees of said employer, in the repairing of a concrete mixer powered with an electric motor, said mixer being located on the mine premises of said employer in Eddy County, New Mexico. At said time and place, an electrical current of 440 volts was connected with the motor on said mixer by means of an extension cord which was plugged into a switch in the mine shop at one end and into the switch on said concrete mixer at the other end. Said extension cord consisted of three wires wound together inside of an insulated carrier or conveyor and all three of said wires were charged with said 440 volt current.

5. That said concrete mixer was powered with an electric motor, and that on said May 28, 1941, said Marcus Neeley was engaged in working the lever on said concrete mixer in an effort to raise the skip on said concrete mixer and test the working thereof; that there had been called to assist in the testing of said machine a mechanic foreman employed by said defendant, Union Potash and Chemical Company, and that the electrical current had been turned on in said machine three times prior to the accident and injury resulting in the death of said Marcus Neeley, and when said electrical current was turned on in said machine the fourth time, and electrical current travelled from the wires leading to said motor with which said concrete mixer was powered into the frame and mechanism of said concrete mixer and into the levers which were being manipulated by said Marcus Neeley and from there into his body, causing the said Marcus Neeley to freeze to said levers and thereby causing injuries to said Marcus Neeley which resulted in his death; that said Marcus Neeley was at such time engaged in an extra-hazardous employment.

6. That said concrete mixing machine was a metal machine mounted on metal frame, and standing upon metal wheels and was so constructed as to be readily moved from place to place about the mine premises of the defendant, Union Potash and Chemical Company, and in its use by the defendant, Union Potash and Chemical Company was in fact moved from place to place on the mine premises of said defendant and was used wholly upon the surface of the ground for the purpose of pouring concrete bases, floors, foundations for buildings, and other similar work in the construction and improvement of the mine premises on the surface of the ground, and was designed wholly for use on the surface of the ground.

7. That prior to the accident complained of and immediately preceding said accident, it had been raining and at the time of the accident, the shoes and clothing of said decedent were damp and the said machine and the ground upon which same was standing and the ground upon which said decedent was standing was wet.

8. That said concrete mixer was purchased by defendant, Union Potash and Chemical Company, from the T. L. Smith Company of Milwaukee, Wisconsin, and was equipped with three-phase electrical

system, and was powered at the time of the accident with an electrical current of 440 volts, and at the time of the accident was located upon the surface of the ground at a point near the machine shop of said defendant, Union Potash and Chemical Company, upon the mine premises.

9. That the wires in conduit leading to the motor in said electrical mixer were insulated wires and in some manner the insulation on one of said wires, had, unknown to the defendant, become worn so as to permit the wire to come in contact with the metal conduit in which same was enclosed, causing a grounding of the current into the metallic parts of the said mixer; that said machine when sold by its manufacturer to the defendant potash company was not equipped with any grounding device, and at the time of the accident was not equipped with any grounding device, and that the only grounding provided for said machine was the contact of the metal wheels thereof with the ground, and with the other metallic parts of said machine, but proper ground wire could have been easily and cheaply attached to said machine in a few minutes.

10. It is unsafe to make use of such an electrical current for such purposes, unless effective grounds are provided so as to prevent persons required to make use of such an electrical current and electrical machinery and apparatus from receiving shocks which are calculated to be fatal. The Union Potash and Chemical Company wholly failed to provide any effective ground of any kind or character for the concrete mixer in question.

11. Two methods in general use exist for the effective grounding of machinery and appliances being operated with an electrical current of high voltage. One means is to employ a grounded cable for the transmission of such electrical energy from the main line to the particular motor or apparatus which is supplied with said current. Such a grounded cable consists of four wires, one of which is a ground wire, and each end of the cable is supplied with a plug consisting of four male ends which are inserted into four sockets or female ends, the male end being constructed so that the grounded wire first makes contact with the permanent ground provided in the female portion of the plug. By the use of such a cable, it would have been impossible for the said Marcus Neeley to have received an electrical shock and to have been killed as a result thereof, while he was operating the levers of said concrete mixer, as above set out. Another effective way in which the said concrete mixer could have been grounded so as to prevent said fatal shock, was the attachment of a ground wire to the frame of said mixer and from thence to a connection with a water pipe or to some other metal object driven into the ground or having a good connection with the ground, and in the event either of the methods herein mentioned had been employed to effectively ground said concrete mixer, the electrical current would have gone through said ground instead of into and through the

body of the said Marcus Neeley and the fatal accident would not have occurred.

12. The use of one or the other of the types of grounds described in these Findings is a general practice adopted by a great many employers using an electrical current of 440 volts for the operation of electrical motors and electrical machinery for the protection of their workmen, and, if our mining statutes exempting portable motors from the use of a ground do not relieve it of negligence, then the Union Potash and Chemical Company was guilty of negligence in failing to supply one or the other of said types of ground for use on said concrete mixer, and the failure of said employer, unless exempted by said statute, to furnish one or the other of said grounds resulted in its failure to furnish to the said Marcus Neeley a reasonably safe place of employment and the failure to furnish such safety devices and safeguards as were reasonably adequate to render the employment of the said Marcus Neeley and his place of employment reasonably safe."

The court arrived at the following conclusions:

"2. That the industry in which the defendant Union Potash and Chemical Company was engaged at the time of the injury and accident which resulted in the death of said Marcus Neeley was an industry for which safety devices are prescribed by the Statutes of the State of New Mexico, to-wit: The Mining Industry, and that the provisions of Section 156-107, New Mexico Statutes Annotated, 1938 Supplement (Sec. 57-907, 1941 Comp.), providing that compensation otherwise payable shall be increased fifty per cent in certain events, may be applied only in such industry where injury to or death of a workman results from the failure of the employer to provide safety devices required by law.

3. That Section 88-4903, New Mexico Statutes Annotated, 1938 Supplement (Sec. 67-2703, 1941 Comp.), provides the voltage with which portable apparatus under ground may be operated, and has no relation to the voltage at which portable apparatus may be operated on the surface of the ground, and has no relation to voltage at which the machine upon which said decedent was employed at the time of his injury and death may be operated, said machine being a portable machine used wholly on the surface of the ground.

4. That under the provisions of Section 88-4908, New Mexico Statutes Annotated, 1938 Supplement (Sec. 67-2708, 1941 Comp.), portable motors are not required to be grounded, said section providing for the grounding of stationary motors, and expressly excluding from its provisions portable motors; that Section 88-4001, New Mexico Statutes Annotated, 1938 Supplement (Sec. 67-2001, 1941 Comp.), is a general statute providing for safety of mine employees, and with respect to voltage to be used and the grounding of appliances is governed by the provisions of Section 88-4903 (Sec. 67-2703) and 88-4908 (Sec. 67-2708), which are specific statutes relating to such subjects, and which prescribe the

duties of mine employers with respect to safety in the use of voltage and the grounding of appliances."

We are permitted to invoke the penalty provision of the statute, appellees contend, under the following circumstances only:

(a) "From the failure of the employer to provide the safety devices required by law, or"

(b) "In any industry in which safety devices are not provided by statute, if an injury to, or death of, a workman results from the negligence of the employer in failing to supply reasonable safety devices in general use for the use or protection of the workman." § 156-107, supra (§ 57-907, 1941 Comp.)

The New Mexico Mine Code contains the following sections, which, appellant urges, are pertinent in support of her contention that the failure to properly and effectively ground the appliance by which the deceased was killed was such a violation of the act as would call for the invocation of the penalty:

"Every mine employer shall furnish such employment and such place of employment as shall be reasonably safe for the employees therein, and shall furnish and use safety devices and safeguards, adopt and use methods and processes reasonably adequate to render such employment and place of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees." Sec. 88-4001, 1938 Supplement (Sec. 67-2001, 1941 Comp.)

"Motors of electric locomotives, loaders, coal cutting machines, and other portable apparatus shall not be operated at a voltage exceeding two hundred fifty (250) volts. Provided, however, that all such equipment in use at the time of the passage of this act may be used and the same may be repaired, replaced or relocated or additions made thereto, if the voltage thereof at no time exceeds five hundred fifty (550) volts." Sec. 88-4903, 1938 Supplement (Sec. 67-2703, 1941 Comp.)

"For transmission purposes underground a voltage in excess of five hundred fifty (550) volts may be used, provided that such circuits are carried inside metallic sheaths or armors with the sheaths or armors permanently grounded. This higher voltage may only be applied to transformers or stationary motors." § 88-4904, 1938 Supplement (§ 67-2704, 1941 Comp.)

"The frames, cases and bedplates of electrical apparatus other than portable motors, such as stationary motors, generators, and transformers and the noncurrent carrying, metallic parts of switchboards, and other electrical appliances shall be effectively grounded." § 88-4908, 1938 Supplement. (§ 67-2708, 1941 Comp.)

Appellant assigns error and argues the same under three points, viz., that liability for the penalty attaches where the death of a mine employee is proximately caused by (1) the failure of the employer to furnish a reasonably safe place of employment or by the employer's failure to use safety devices or safeguards or methods

reasonably adequate to render such employment safe; (2) where the death of an employee is proximately caused by the failure of his employer to provide an effective ground for a portable concrete mixer powered with an electric motor using an electric current of 440 volts; (3) and that a mine employer is required to furnish not only such safety devices as are specifically required by law, but also such reasonable safety devices as are in general use.

The trial court found, in substance, that the employer failed to furnish a reasonably safe place of employment and likewise failed to use safety devices or safeguards and methods reasonably adequate to render the deceased's employment safe, but reasoned, obviously, that since such employer had fully and completely complied with the Mining Code in its adoption and employment of all safety devices required of it so far as pertinent to this case, that then the other, and general, provision of the statute relied upon by appellant cannot apply; that is to say, (a) that an employer engaged in mining, an industry in which safety devices are provided by statute, cannot be subjected to the fifty per centum penalty where the negligent act complained of is impliedly permitted by a specific safety statute; (b) that the concrete mixer was "portable"; (c) that the motor in the concrete mixer was therefore a portable motor; (d) that the concrete mixer was not used underground and was not intended for use underground; (e) that Section 88-4903, 1938 Supplement (§ 67-2703, 1941 Comp.), which prohibits the use of a voltage in excess of 250 volts on portable apparatus, applies only to underground portable apparatus and for this reason does not limit the voltage which may lawfully be used on apparatus used on top of the ground; (f) that Section 88-4908, 1938 Supplement (§ 67-2708, 1941 Comp.), provides for the grounding of electrical apparatus other than portable motors and that this section impliedly permits the use of portable motors without grounds; (g) that the section last mentioned is applicable to apparatus used on top of the ground, and, it being lawful to use a portable motor on top of the ground with no limit as to voltage, and the statute having required the grounding of stationary apparatus without also requiring the grounding of portable apparatus, impliedly authorizes the use of portable apparatus without grounds, so that the employer as a matter of law was not guilty of negligence in failing to ground the concrete mixer.

The trial court held, as we have seen, that neither of the last above mentioned three sections of the statute dealing with voltage, electrical apparatus and grounding are applicable to the concrete mixer upon which the deceased was killed. It concluded that this was a portable motor, and that by Section 88-4908, supra (§ 67-2708, 1941 Comp.), it was expressly excluded from the requirement for "grounding" as a safety device.

Appellant would also have the 50% penalty attach because of the alleged failure

of the employer to supply safety devices even if not specifically required by the statutes regulating the mining industry, if such are generally in use in industries in which safety devices are not governed, or required, by law. The trial court concluded, as a matter of law, that this could not be done, and that ·the language taken from the statute and above quoted, viz., "In any industry in which safety devices are not provided by statute, if an injury to, or death of, a workman results from the negligence of the employer in failing to supply reasonable safety devices in general use for the use or protection of the workman", could have no application to the mining industry because of the full and complete regulation by law, and the specification of the safety devices to be used in that particular industry.

Appellant bases, substantially, her whole case upon the failure of the employer to provide perfect "grounds" for a "portable" concrete mixer used exclusively on top of the ground. Appellees say the only statute regulating the grounding of machinery used upon the surface is Section 88-4908, supra (§ 67-2708, 1941, Comp.); and that "portable motors" are expressly excluded from the operation of this section. It provides that the "frames, cases, and bedplates of electrical apparatus other than portable motors" shall be effectively grounded.

Appellant relies also upon the safe working place statute (§ 88-4001, supra; § 67-2001, 1941 Comp.) in support of her contention that the employer's failure to properly ground the concrete mixer, or motor, invokes the penalty urged.

We pass all questions presented except the narrower and decisive one now to be further noticed, which has to do with "portable motors" as the term relates to the machine in question. The trial court properly treated the matter of proper grounding when required, as a "safety device", but erroneously held that the movable concrete mixer in question operated by a motor attached thereto, was a "portable motor" within the meaning of the statute, and, therefore, was exempt from the operation of the statute. § 88-4908, 1938 Supplement; § 67-2708, 1941 Comp. The findings of the court thus support judgment for appellant, although its erroneous conclusion of law defeats the claim.

The trial court was therefore in error in so concluding that the machine in question was a "portable motor". The motor, attached to the mixer, was only a part thereof. It was only a part of the unit—the concrete mixer. We cannot say that because the unit was itself movable, or portable, and that because it was powered by a motor, a part thereof, that we have a "portable motor" within the meaning of the exception mentioned in the statute. If that be the interpretation, the statutory exception would include any motor driven piece of machinery used in mining operations, however large or cumbersome or however heavy the voltage which the power would require, if the machine

be one which could be moved from place to place as operations required. Thus, the obviously desirable safety measure of grounding such machinery would fall without the statute. We hold that the statute requires the grounding of the machinery in question, as a "safety devices required by law", and the failure to so ground was a violation thereof which invoked the penalty contended for.

The other question has to do with what allowance should have been made for the period of time between the death of the workman and the birth, expected in January, 1942, to appellant of a child then en ventre sa mere. The contention is that no provision is made for any increase in the payment to a widow of a deceased workman for a child en ventre sa mere until such child is thereafter born alive. The child in question was born in December, 1941, and is now living, it might be added. It is admitted that a child en ventre sa mere at the date of the accident and subsequently born alive is a dependent within the meaning of the statute (§ 156-112, 1938 Supp., N.M.Stat.Ann., 1929 Comp.; § 57-912, 1941 Comp.), which also provides that a posthumous child comes within the definition of dependent children. The statute also provides that "the relation of dependency must exist at the time of the injury" and that questions as to who "constitute dependents, and the extent of their dependency, shall be determined as of the date of the injury". The statutory allowance, with a maximum, is 40% for a dependent widow with one child.

The trial court awarded 45%, and not exceeding $18 per week, for the statutory period of 300 weeks, with the payments to commence one week after the accident, and therefore before the child was born. The amount actually involved in this particular dispute over this novel question, is exactly $55 as nearly as able counsel can compute, but a rather extended brief is devoted to a discussion of the point by counsel. Counsel for cross-appellants see support for their contention in the fact that provision is made in the statute for a posthumous child but not specifically for a child en ventre sa mere.

Cross-appellants concede the general rule to be that a child en ventre sa mere is in esse from the time of its conception for all purposes beneficial to it, if subsequently born alive, but distinguish cases which appear to support cross-appellee's contention, among them being the Utah Copper Co. v. Industrial Commission, 57 Utah 118, 193 P. 24, 13 A.L.R. 1367, discussed by all counsel. In Utah, they say, the award is unaffected by the number of dependents and that it would be the same whether such child be born dead, and that in addition, in New Mexico, unlike in Utah, the child probably has no property right to protect until the death, or remarriage, of the widow, its mother—since all benefits are paid to the widow so long as she lives and remains unmarried. It is conceded by cross-appellants that if our statute gave a child a direct property interest in the award there would be ample authority for an allowance to the mother in its favor

covering the prenatal period in question. That concession seems justified. Cases are cited by cross-appellants themselves in support thereof.

We are asked, in this connection, to determine whether, under our statute, a property right is given such child. This is an interesting query but we need not pursue it further here. Counsel for cross-appellees is inclined to agree that a good case could, perhaps, be made in support of that contention, but urges that a decision of the point is unnecessary to a determination of the issue; and we so agree.

We know that the statute gives to the widow 5% over that ordinarily allowed, "if there be one child". Section 156-117 (a) (3) 1938 Supp.N.M.Stat.Anno.1929 Comp. (§ 57-918, 1941 Comp.); and, that under Section 156-112(k) (§ 57-912, 1941 Comp.) one posthumously born is considered a "child" within the meaning of the above quoted sections. We likewise know that who are dependents and the extent of their dependency are to be determined "as of the date of the injury, and their right to any death benefit shall cease" upon the happening of any one of certain contingencies, one of them being, "upon the death of any dependent".

■ The district court, we hold, resolved the question correctly. It adjudged that the widow should be paid the 45% of the average weekly wages, subject to the maximum of $18 permitted, from the date of the workman's death, but provided that if the child should be born dead, or should die after birth, the amount should be reduced to 40%.

It should be borne in mind that we do not have, as do some states, a statute providing for an increase of the compensation percentage upon the birth alive of a posthumous child. There can be no increase, though there may be a decrease if the child should die. And, dependency must be determined as of the date of the injury, as we have said.

We are not prepared to concede, therefore, that the legislature intended to leave open and unprovided for that period of time when the widow is pregnant with child of the deceased, when she alone must bear the expense of its birth, not to mention other considerations, such as a reducing earning power ordinarily to be expected during a large portion of the period of pregnancy. The legislature has provided in the same act that the number of children shall become the measure of the award allowable to the widow above the 40%; and it has, likewise, provided that the child of a deceased, born after a parent's death, is a child within the meaning of the act as it relates to fixing the amount of compensation to be paid the widow for the benefit of herself *and* dependent children.

We are not prepared to say that the child has a *direct* property interest in such award, as the term is ordinarily used, and yet as we have heretofore said, we pass that particular question without deciding it; but we cannot ignore the plain inten·

to be found in the language of the statute as a whole. It will be noticed that under subsection "j" of Section 156-112, supra, (§ 57-912, 1941 Comp.) we have this language: "The following persons, and they only, shall be deemed dependents and *entitled to compensation* under the provisions of this act". (Emphasis ours.)

The spirit of the act, certainly, if not the letter, exactly, is contrary to cross-appellants' contention. In their cross-appeal appellees also challenge the method employed and the results obtained by the court in calculating the earnings of the deceased so as to arrive at the average weekly wage. This was done by totaling the weekly amounts received by the deceased for the preceding year as wages from the employer, and dividing this by 52. In taking the total earnings for such period of a year, all overtime as well as regular time payments were included. The rather full and complete findings of the court, incorporated herein, make it pretty clear how the average was ascertained and applied by it. We do not feel that a minute analysis or appraisement of the testimony is necessary. We find substantial support in the testimony for the court's findings upon the question of average weekly earnings of the workman, and we inquire no further. We cannot say that the calculation made as to the amount earned is not substantially correct. The cross-appeal is without merit, and the judgment, as to it, should be, and is hereby affirmed.

The judgment will be reversed and the cause remanded with instructions to set aside the judgment heretofore entered, and to ascertain the total amount of compensation to which appellant is entitled in accordance with this opinion, this to be for the amount heretofore granted, plus the 50% statutory penalty provided (which 50% additional liability is to be recoverable, however, only from the employer, the Union Potash and Chemical Company) and to enter judgment therefor. The attorney fees for appellant for services of her attorney in the district court have been heretofore fixed, the amount being based upon the contingency of appellant prevailing upon her appeal; but appellant claiming, and being entitled, to additional attorney fees for and on account of the prosecution of this appeal, it is therefore further ordered that attorney fees in the additional sum of $500 be allowed appellant on account of the appeal herein, and

It is so ordered.

SADLER, BICKLEY, and BRICE, JJ., concur.

ZINN, C. J., being absent, did not participate.

On Motion to Modify.

MABRY, Justice.

The appellee, Union Potash and Chemical Company, having filed a motion to modify or clarify our decision and opinion heretofore rendered, we announce that it was not intended by anything said in the opinion to distinguish between the use of the

words "additional compensation" and the word "penalty", as pertaining to the 50 per cent. additional liability, nor to foreclose a consideration or decision as to the right of the Union Potash and Chemical Company to litigate with the insurer the question of liability as between such parties. Neither was it intended to decide the question as to whether under the pertinent statutes the workman could recover the 50 per cent. additional liability from both the employer and the insurer.

SADLER, BRICE, and BICKLEY, JJ., concur.