678 P.2d 219
**Guillermo Ortega GOMEZ,
Plaintiff-Appellee,**

v.

**SNYDER RANCH and Wausau
Insurance Companies,
Defendants-Appellants.**

**No. 7153.**

Court of Appeals of New Mexico.

Dec. 6, 1983.

Certiorari Quashed March 20, 1984.

Frank L. Spring, Duhigg & Cronin, Albuquerque, N.M., for plaintiff-appellee.

Mark B. Thompson, III, Leland S. Sedberry, Jr., Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, N.M., for defendants-appellants.

**OPINION**

BIVINS, Judge.

From a judgment awarding a minor dependent weekly benefits under the Workmen's Compensation Act, defendants appeal raising four issues, each of which they claim require reversal. Because it is dispositive of this appeal, we address only one issue: what is the domicile of a child not yet born at the time of his parent's injury under the Workmen's Compensation Act? We hold that the child's domicile is the domicile of the parent with whom he resides at the time of his birth. Because that domicile was outside the United States, we reverse.

On March 19, 1981, while employed as a ranch hand by defendant Snyder Ranch, Guillermo Ortega Ponce and a co-worker were instructed by the foreman's son to leave their duties hoeing weeds and assist in taking down an electric fence. The two men proceeded to the site of the fence while the foreman's son went to obtain wheels for rolling the wire. While waiting at the site the two workers crossed a dirt road and attempted to "shake" a rabbit out of a thirty-foot movable aluminum irrigation pipe. They lifted the pipe and in doing so it came into contact with a highline electric wire. Mr. Ponce died of electrocution.[1]

At the time of the accident Mr. Ponce lived on the Snyder Ranch with Marcelina Gomez Herrera who, although not married to him, was pregnant with his child. Following the accidental death of Mr. Ponce, Ms. Herrera returned to Mexico where she gave birth on October 4, 1981, to Guillermo Ortega Gomez, the minor dependent making the claim in this case.

NMSA 1978, Section 52–1–52 provides in part:

---

1. For a case with almost identical facts, see *Ranger Ins. Co. v. Valerio*, 553 S.W.2d 682 (Tex. Civ.App.1977).

No claim or judgment for compensation, under this act [citation omitted] shall accrue to or be recovered by relatives or dependents not residents of the United States at the time of the injury of such workman.

The trial court found:

19.

At the time of Guillermo Ortega Ponce's death, his son, Guillermo Ortega Gomez, was *en ventre sa mere.*

20.

At the time of Guillermo Ortega Ponce's death, Guillermo Ortega Gomez's mother, Marcelina Gomez Herrera, was residing on the Snyder Ranches with Guillermo Ortega Ponce as his dependent but was not his wife nor is she his widow or related to him under New Mexico law.

21.

At the time of Guillermo Ortega Ponce's death, Guillermo Ortega Gomez was residing *en ventre sa mere* on the Snyder Ranches.

22.

At the time of Guillermo Ortega Ponce's death, Guillermo Ortega Gomez was his dependent.

Ms. Herrera testified that Mr. Ponce fathered the child, and there was no evidence to the contrary.

In *Neeley v. Union Potash & Chemical Co.*, 47 N.M. 100, 137 P.2d 312 (1943), the Supreme Court affirmed a judgment allowing a widow to recover 45% of the worker's average weekly wages from the date of his accidental death, with the condition that if the child *en ventre sa mere* at the date of the accident should be born dead or die after birth, it would reduce the amount to 40%. The court expressly refrained from deciding whether the unborn child has a direct property right from the date of the accident until birth. The Court decided the case on the basis that the widow was entitled to the additional 5% for the unborn child from the date of accident, subject to reduction by that amount if the child was born dead or died after birth.

· Here we have no widow entitled to benefits. The trial court found that under New Mexico law Ms. Herrera was entitled to no benefits, and no appeal was taken from that ruling.

The rationale of *Neeley* would clearly suggest that a child *en ventre sa mere*, if born alive, would have a direct property interest dating back to the time of the accidental death; however, we need not decide that question here. The residency statute bars recovery.

■ A minor at the time of birth has the same domicile as the parent with whom he lives. *See Worland v. Worland*, 89 N.M. 291, 551 P.2d 981 (1976); Restatement (Second) of Conflict of Laws § 22, § 14 (1971). Section 22 comment c, states: "At birth an illegitimate child takes the domicil his mother has *at the time* as his domicil of origin." (Emphasis added.) Section 14, in defining "Domicil of Origin", provides in part:

(1) The domicil of origin is the domicil which a person has at birth.

(2) * * * If the child is not the legitimate child of its father, or is born after the father's death, its domicil at birth is the domicil of its mother at that time.

■ It is undisputed that the mother's domicile at the time of her child's birth was in Mexico. Thus, that was her child's domicile. He could have no domicile before birth. His domicile at birth relates back to the time of the injury.

In *Gallup American Coal Co. v. Lira,* 39 N.M. 496, 50 P.2d 430 (1935), the Supreme Court, in construing the legislative intent of the statute in question (then Comp.St.1929, § 156–120), said:

The Legislature evidently intended that dependents of alien laborers who had never lived in the United States or, who having been domiciled here, had permanently left this country, should not be beneficiaries under this act; but that those dependents who are domiciled in

the United States should be beneficiaries thereunder.

Although this case could be construed to equate "residence" with "domicile", we need not resolve the question at this time. The child's claim fails no matter which requirement we apply.

Because the dependent minor was not a resident or a domiciliary of the United States at the time of the injury, he has no claim under the Workmen's Compensation Act and may not recover benefits. *See Pedrazza v. Sid Fleming Con., Inc.,* 94 N.M. 59, 607 P.2d 597 (1980).

The judgment is set aside with instructions to dismiss plaintiff's complaint with prejudice.

**IT IS SO ORDERED.**

LOPEZ, J., concurs.

WALTERS, C.J., dissents.

WALTERS, Chief Judge (dissenting).

I am unable to agree with the majority.

1. The equation of "domicil of origin" with "resident of the United States at the time of the injury" is simply not logical or reasonable. "Domicil of origin" is determined at the time of birth. Restatement (Second), Conflict of Laws, § 22. *Residence* at time of injury, when speaking of an unborn child, must of necessity be the *residence* of the mother who is carrying the child at the time. The question, then, is not where the child resided (or was "domiciled") at the time he was born, but where he resided when his father was fatally injured.

In my opinion, *Neeley v. Union Potash and Chemical Co.,* cited by the majority, unquestionably recognized an unborn child as an *in esse* dependent *at its father's time of injury.* That case upheld a trial court award provision that the widow receive a benefit for herself and the child *en ventre sa mere,* and that the amount allocable to the unborn child would be terminated if the child were born dead. *Neeley,* therefore, settled the undeniable compensation rights of the child not yet born *at the time of the*

*workman's injury and death.* In the case before us the questions remaining, then, are whether the fetus, at the time of its father's death, was a resident of the United States, and whether the law applying to minors applies to a fetus.

That a child's *residence or domicil* may be different after birth than it was before is, of course, dependent upon its mother's *residence* or *domicil* before and after its birth. Our statute does not refer to domicil; it speaks of *residency* of the eligible dependents. Section 22 of the Restatement on Conflicts addresses the issue of "Domicil of Minor"—which may or may not have application to the precise issue of residency which faces us. We are confronted, also, with the existence of a fetus, not with an existing, independently living and breathing minor, with which the Restatement deals. Nothing in the Restatement is directed toward a fetus; however, we are led toward its restatements regarding minors because, if nothing else, a fetus is certainly "a person under full age * * * or majority." Webster's Third New International Dictionary (1976 ed.).

Comment k of § 11 of the Restatement, *Conflicts,* says: ·

Statutes in the United States rarely speak in terms of domicil but use "residence" instead. Residence is an ambiguous word whose meaning in a legal phrase *must be determined in each case.* Frequently it is used in a sense equivalent to domicil. *On occasion it means something more than domicil, namely, a domicil at which a person actually dwells.* On the other hand, it may mean something else than domicil, namely, *a place where the individual has an abode or where he has settled down to live for a period of time,* but not necessarily with such an intention of making a home there as to create a domicil. The phrase "legal residence" is sometimes used as the equivalent of domicil. (My emphasis.)

The examples of the interpretations of "residence" which follow in that comment do not cover the case at hand. But if we

assume that a fetus has a "residence," because a fetus is a "person" recognized in the law (*see Salazar v. St. Vincent Hospital*, 95 N.M. 150, 619 P.2d 826 (Ct.App. 1980)), then certainly this unborn child, residing in its mother's womb at the time of the accident, was a resident of the United States because, under the Restatement comment and under *State v. Williams*, 57 N.M. 588, 261 P.2d 131 (1953), and *Montoya v. Collier*, 85 N.M. 356, 512 P.2d 684 (1973), the mother was at that time a resident of New Mexico. "Residence is made up of fact and intention. There must be the fact of abode and the intention of remaining." *Williams*, 57 N.M. 593, 261 P.2d at 134. The mother resided at the Snyder Ranches, and intended to stay there as long as decedent worked there. If "time of the injury" is the operative factor, then domicil of origin cannot affect the unborn child's entitlement because entitlement is determined as of the time of injury.

The law in a workmen's compensation case is to be construed liberally to effectuate the intention of the Act. *Avila v. Pleasuretime Soda, Inc.*, 90 N.M. 707, 568 P.2d 233 (App.1977). We, therefore, must construe the meaning of "resident" liberally (as I have earlier so construed it in view of the fetus's existence in its mother's womb), and on a case-by-case basis. Comment k, *supra*. In my opinion, the majority has beclouded its decision by the arbitrarily interchangeable use of "residence" and "domicil," to the detriment and disadvantage of the minor plaintiff. The majority has applied the child's birthplace some six months after its father's death to determine its residence six months earlier. "Domicil" and "residence" are not equivalent nor interchangeable; the Legislature did not intend that they be or it would have used the terms interchangeably.

Liberally construing "residency," I am persuaded that the unborn child was a resident of New Mexico when its entitlement came into being (*Neeley, supra*), and it could not thereafter be divested of its right to compensation benefits resulting from its father's death merely because its mother left her residence in New Mexico after her common-law husband was killed. At the time of the workman's death, the child's mother was a New Mexico resident because she had "settled down to live [in New Mexico] for the period of time" that Guillermo Ponce lived and worked here; ergo, the child she was carrying, because it had no choice nor voice in the matter, had done the same. Any attempted explication of the status, or residence, of a fetus while it is still a fetus that is different from its mother's status or residence creates a fiction, and makes a sham of the immutable facts of creation, existence *in esse*, and the dependency of a fetus upon the life-giving sustenance of its mother.

The majority relies on dicta in *Gallup American Coal Co. v. Lira*, 39 N.M. 496, 50 P.2d 430 (1935), to differentiate between a dependent American wife of Mexican origin—absent in Mexico at the time of her husband's death (and for at least *seven years* previously) because she was caring for his sick and aged mother—determined, consequently, not to be a resident of Mexico—and a child living within a Mexican woman residing in New Mexico when the child's father was killed, who returns within its mother to Mexico after its father's death. I am unable to see why an adult woman who chooses to obey her husband's request that she leave the United States before he is killed and is nevertheless determined, for purposes of obtaining a widow's compensation award, to be a United States resident, should be treated differently from a child who is carried outside the United States within its mother's womb *after* its father's death, and is determined not to be a United States resident *at the time of the death*.

The *Lira* court interpreted the meaning of "not a resident of the United States" to apply to one who had "never an intention that * * * temporary residence [in Mexico] should be a permanent abode." 39 N.M. at 501, 50 P.2d at 434. Here, as I have noted, the child's mother testified that she had intended to remain in the United States. The mother's United States residency at the time of Ponce's death is an undisputed

matter "of fact and intention," *Williams;* the unborn child's residency at the time automatically was identical. *Lira* resolved the problem of construing the language of the Act to find eligibility for the widow; we should do likewise.

I would hold that the child had its *residency* in New Mexico at the time of its father's fatal injury. Because I would so hold, it is necessary to consider defendant's other points on appeal.

2. The first issue raised by appellants is their claim that suit was barred by the statute of limitations. The Consul of Mexico initially filed for benefits as the personal representative of the deceased worker. Defendants assert that the original plaintiff was not a proper party to bring the action and that she failed to join necessary and indispensable parties.

The original complaint, filed in November 1981, was filed well within the one-year statute of limitations. NMSA 1978, § 52–1–31(B). On April 6, 1982, the Consul moved to amend to add, as additional party plaintiffs, Marcelina, alleged to be the widow of the worker, and Guillermo, alleged to be a dependent child of the worker. The trial court granted the amendment, dismissing the original plaintiff at the beginning of trial and proceeding on the amended complaint of the mother and child. When plaintiffs rested, the court dismissed Marcelina's claim on the ground that she was not an eligible claimant. No appeal was taken from that ruling.

In its order allowing the amendment, the trial court made specific findings which tracked the requirements of NMSA 1978, Civ.P.R. 15(c) (Repl.Pamp.1980). The court found that the November 1981 complaint provided defendants with adequate notice of the claim, and identified the claimants, even though at the time plaintiff was not aware the child had been born. The court also found that the Mexican Consul was a proper party to represent the interests of the mother and child. Finally, the court found that the amendment to add the mother and child would not enlarge the claim nor prejudice the defendants.

Defendants contend that because the original complaint failed to state a claim, there was nothing to relate back to as of the date of filing the amended complaint.

The assertion that the complaint failed to state a claim is based on the Mexican Consul's failure to allege that she was a dependent of the worker, or that she was suing on behalf of or as next friend of any of his dependents. Defendants cite Sections 52–1–17 and 52–1–46 as requiring that the claim be brought by or on behalf of the dependents. I agree with the trial court's finding that the Mexican Consul was a proper party to represent the interests of the alleged dependents. Section 52–1–31(B), provides in part:

No claim shall be filed, however, to recover compensation benefits for the death of the workman unless he or someone on his behalf, or *on behalf of his eligible dependents,* has given notice in the manner and within the time required by Section 52–1–29 NMSA 1978, and unless the claim if filed within one year from the date of the workman's death. (Emphasis added.)

This provision means that the filing of the claim, as well as the giving of the notice, may be made by someone on behalf of the deceased workman, or on behalf of the eligible dependents. The Mexican Consul met both conditions. She filed as personal representative of the estate of the worker. Although she did not expressly allege that the claim was being made on behalf of the eligible dependents, a plain reading makes this obvious. The dependents were identified, Marcelina by name, and the child by allegations of the pregnancy of the mother by the worker. I note, also, that the Mexican Consul is authorized by treaty to file on behalf of Mexican Nationals. *See* Treaty Series 985, *Consular Officers, Convention Between the United States of America and Mexico* (1943).

Moreover, the amended complaint set forth a claim which arose out of the same occurrence alleged in the original complaint, thus meeting the requirement of relation back under Rule 15(c). I would

hold that the amended complaint related back and therefore was not barred by the statute of limitations. *See Galion v. Conmaco Intern., Inc.,* 99 N.M. 403, 658 P.2d 1130 (1983).

3. Defendants next raise the question whether decedent had acknowledged the minor child.

Under Section 52–1–17 of the Workmen's Compensation Act, a dependent entitled to benefits includes a child under eighteen years of age or incapable of self-support and unmarried. The claimant meets these requirements if he comes within the definition of a "child." Section 52–1–18 defines "child" to include posthumous children and "acknowledged illegitimate children." We know the child was born posthumously, but the specific issue is whether the father ever acknowledged him, since he and the child's mother were unmarried.

The trial court made the following findings relevant to this issue:

22. At the time of Guillermo Ortega Ponce's death, Guillermo Ortega Gomez was residing en ventre sa mere on the Snyder Ranches.

23. In January of 1981, Guillermo Ortega Ponce became aware that Marcelina Gomez Herrera was pregnant.

24. During January, February, and March of 1981, up until the time of his death, Guillermo Ortega Ponce continued to reside with Marcelina Gomez Herrera on the Snyder Ranches under the same roof.

25. During January, February, and March of 1981, up until the time of his death, Guillermo Ortega Ponce provided food and shelter from his earnings at the Snyder Ranches for Marcelina Gomez Herrera and for Guillermo Ortega Gomez, who was at that time en ventre sa mere.

26. At the time of his death, Guillermo Ortega Ponce had acknowledged Guillermo Ortega Gomez as his son.

Defendants argue that, notwithstanding these findings, there was no evidence of acknowledgement by the worker that the child was his illegitimate son, prior to his

accidental death. Obviously, Ponce could not formally acknowledge a child born after his death. Plaintiff does not contend that there was any formal acknowledgement of parentage by the worker, but says the conduct as found by the court was sufficient.

The initial question, then, is whether the worker's providing of food and shelter, and cohabiting with the mother while aware she was pregnant with his child, suffices to prove acknowledgement. Since no New Mexico case has decided the question, we must look to other jurisdictions.

On facts remarkably similar, the court, in *Texas Employer's Insurance Assn. v. Shea,* 410 F.2d 56 (5th Cir.1969), held:

The record shows that Rose Grizzaffi Clark cohabited with the deceased for four months before his death and that Rose was four months pregnant at the time of his death. This is sufficient evidence to support the Deputy Commissioner's finding that Clifford knew Rose was pregnant. Since acknowledgement of paternity does not require a notary's seal or any other ritualistic proclamation, we hold that Clifford's continued cohabitation with Rose with knowledge of her pregnancy justifies the almost inescapable inference that he acknowledged Elizabeth Marie before his untimely death.

410 F.2d at 61.

Cases holding *contra* can be found in Annot., 18 A.L.R.3d 900 at 905.

We should adopt the *Shea* approach, a case brought under the Longshoremen's and Harbor Worker's Compensation Act, as being most appropriate and in keeping with the remedial purposes of our Workmen's Compensation Act and the requirement that it be liberally construed to effect its purpose. *See Armijo v. Middle Rio Grande Conservancy District,* 59 N.M. 231, 282 P.2d 712 (1955).

Defendants in their reply brief call attention to *Weber v. Aetna Casualty & Surety Co.,* 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972), which held that Louisiana's de-

nial of the equal recovery rights to dependent unacknowledged illegitimate children violates the Equal Protection Clause of the Fourteenth Amendment. Counsel are to be commended for their candor, but because that issue has not been raised, it is not necessary to reach the constitutional question on this appeal.

I would hold the evidence sufficient to support the findings regarding decedent's acknowledgement of his unborn child.

4. Finally, defendants contend that the fatal injury did not arise out of and in the course of plaintiff's employment. First, they argue that shaking a rabbit out of a pipe was not incidental to Ponce's employment. Second, they rely on the employer's instructions that the workers were not to chase rabbits.

In addition to the facts already set forth in this and in the majority opinion, the trial court found that the accident occurred during a six-minute enforced lull and on the employer's premises. Finding 12 was that at the time of his death, "Ponce's employers had instructed the employees not to chase rabbits."

Our supreme court recently had occasion to consider the enforced lull component of the personal comfort doctrine. In *Velkovitz v. Penasco Independent School Dist.*, 96 N.M. 577, 633 P.2d 685 (1981), injuries suffered by a faculty sponsor while skiing were held compensable. In that case the faculty members escorting the students and responsible for supervising them while they were skiing were instructed only to supervise the students to and from the area and while the students were in the lodge before and after skiing. During the period in which the students were allowed to ski by themselves, the plaintiff teacher went skiing and injured her knee while doing so. The court said, "The leeway accorded an employee during an enforced break in his work extends to a certain amount of wandering around and even undertaking what might seem to be distinctly personal activities." 96 N.M. 578, 633 P.2d at 686.

Other New Mexico cases have applied the personal comfort doctrine to bring the employee's activities within the scope of employment at the time of his injury. *See Whitehurst v. Rainbo Banking Company*, 70 N.M. 468, 374 P.2d 849 (1962) (worker injured during break while going for cup of coffee); *Sullivan v. Rainbo Baking Company*, 71 N.M. 9, 375 P.2d 326 (1962) (worker injured while in route to cafe for meal).

In his treatise, Professor Larson states:

If the primary test in horseplay cases is deviation from the employment, the question whether the horseplay involved the dropping of active duties calling for claimant's attention as distinguished from the mere killing of time while claimant had nothing to do assumes considerable importance. There are two reasons for this: first, if there were no duties to be performed, there were none to be abandoned; and second, it is common knowledge, embodied in more than one old saw, that idleness breeds mischief, so that if idleness is a fixture of the employment, its handmaiden mischief is also.

Most cases now give considerable weight to this factor in dealing with participants in horseplay. They recognized that workmen whose jobs call for vigorous physical activity cannot be expected, during idle periods, to sit with folded hands in an attitude of contemplation. They must do something, and the most natural thing in the world to do is to joke, scuffle, spar, and play with the equipment and apparatus of the plant.

1A Larson, The Law of Workmen's Compensation, § 23.65 (1972).

*Velkovitz* did not discuss horseplay or skylarking, because it was concerned with a recreational pursuit, personal in nature. But very few activities qualifying as horseplay or frolicking could be said to have a direct connection to the workman's employment; there is, however, an analogy to the personal comfort cases since both personal comfort and horseplay doctrines are concerned to some degree with the basic claim of deviation and what circumstances will suffice to hold the employer within the

scope of employment, and which will not be so treated.

It is clear from the context of the evidence regarding the employer's admonition to employees not to chase rabbits that the employer was concerned that his employees not waste time on the job. They were told, "No trabajo, no dinero"—no work, no pay. It is obvious that the instruction was not given for the workmen's safety or health, *see Lukesh v. Ortega*, 95 N.M. 444, 623 P.2d 564 (1980), but solely to assure the employer that he was getting a full day's work for a day's wages. During an "enforced lull," however, an otherwise forbidden time-waster becomes no more forbidden than if the idle workers had engaged in a game of cards—which likewise would have been a time-waster if indulged in during working hours. During an "enforced lull," an employee has no active duties which the employer may consider to have been dropped.

The trial court's Finding 12 was the only finding not wholly favorable to the infant plaintiff in this case. Defendants claim that the finding makes the judgment unsupportable. I do not agree. Finding 12 is a thin thread, in view of the other 29 findings made by the trial court, upon which to hang a reversal. We are bound to apply the rules of appellate review requiring us to resolve any doubtful findings in support of the judgment, *Guaranty Banking Corp. v. Western Ice and Bottling Co.*, 28 N.M. 19, 205 P. 728 (1922), and to reconcile any apparent inconsistencies in the findings, *Massey v. Beacon Supply Co.*, 70 N.M. 149, 371 P.2d 798 (1962); *Hogan v. City of Hot Springs*, 58 N.M. 220, 269 P.2d 1102 (1954). Doing so, it is not difficult to read Finding 12 as an instruction that employees could not, during working hours, chase rabbits. Viewing evidence in the light most favorable to support the findings and the judgment, as we are obliged to do, *Massey*, we must read together the ultimate facts found by the court, and agree with the trial court that plaintiff's death occurred during an employer-induced hiatus in the work-day; thus bringing the

accident within the scope and course of the worker's employment. *Larson, supra.*

I would affirm the judgment in all respects. My colleagues holding otherwise, I respectfully dissent.