306 P.2d 648

Gregorita RIVAL, Administratrix of the Estate of Filemon Rival, Deceased, Plaintiff-Appellee,

v.

The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, a corporation, Defendant-Appellant.

No. 6050.

Supreme Court of New Mexico.

Jan. 22, 1957.

Bryan G. Johnson, Richard G. Cooper, Albuquerque, for appellant.

Lorenzo A. Chavez, Arturo G. Ortega, Albuquerque, for appellee.

KIKER, Justice.

Plaintiff's intestate was a man 26 years of age, a common laborer. A considerable portion of his working life had been spent in doing labor for farmers and ranchers. At times he had worked for the Santa Fe Railroad, as he was doing on the occasion when and where, the complaint charges, his death should be attributable to negligence on the part of that company.

He had been in the armed forces of the United States for a period of about two years and, recently, had been discharged therefrom. After his discharge, he remained at the home of his parents for about six months, working for local ranchers and hauling wood for his parents' home. Only a few days before the date of his death he went to work for the defendant railroad as an extra gang or track laborer, commonly called section hand.

It was decedent's common practice to turn over his earnings to his mother for family use. His mother would return to him, upon his request, small sums of money, such as a dollar, to attend a dance, or a like amount for a haircut or for some entertainment, and such money as he needed for clothes. While decedent was in the government service his mother was classified as his dependent and received the monthly allotment. From his earnings, a car had been purchased and the title was in the names of both his mother and himself. He had purchased a part of the furniture in his parents' home, and a small business had been established with money earned by him. This was operated by his parents, but was closed after his death.

On June 17, 1954, a hot day, decedent was working, as above stated, near Dexter,

New Mexico. During the lunch hour he and a fellow worker had their lunch together. After lunch, at 1:00, the section gang returned to work. At some time after decedent had returned to work, the testimony being uncertain as to the length of time that elapsed after so returning, he became ill. There is testimony which would indicate that he felt sick about 1:30; and there is other testimony that the time of his so complaining was between 1:30 and 2:00; and there is further testimony that his first complaint of being sick was made at some time later than 2:00. He was one of a group of laborers who used bars with which to pull or push the track, according to the directions of a man who cried out to them whether to pull or push. He first paused in his work, made another effort, and finally dropped his bar or threw it down, and told a fellow worker that he was sick and could not work. This man told him to go into the shade of a toilet building, about 15 feet distant from the place where they were working. He went there and sat in the shade of that building about 15 minutes, after which he moved a distance of about 150 feet across a roadway into the shade of some trees. There he remained for an uncertain period of time.

There is testimony that, during the short time decedent spent in the shade of the toilet building, he was moving his arms. There is further testimony that when he got up from that place to go into the shade of the trees across the road, he was mumbling, but what he said was not understood by the man who heard him. While decedent was under the shade of the trees he continued moving his arms about and was moving his legs.

After decedent had left his work, the man acting as foreman of the extra gang came up and inquired as to what was the matter with the boy. He was told that decedent was sick and that he had better go tell decedent's father, who was working in the regular section gang at some distance away. This extra foreman started in that direction, but stopped, and sent another man to give that notice. How much time had elapsed since decedent first left his work, and the attempt to notify his father, is not shown by the record. The man who gave the notice came back with the father in the direction of the trees where decedent had been lying in the shade.

The general foreman of both the regular gang and the extra gangs came upon the scene and was told about decedent's having become ill. Before the father got to where decedent had been in the shade, decedent was picked up by the general foreman and two other men and carried away to a doctor's office at Dexter, about 700 feet from the shade of the trees. Before the general foreman and the other men had picked up decedent he had begun to crawl back across the road.

After reaching the office of Dr. E. J. Hubbard, decedent became violent and struck the doctor, so that the doctor was prevented from doing more. Officers were called, and after a time decedent was removed to the hospital at Roswell, a distance of nearly 20 miles. The testimony shows that decedent's condition, at the time he reached the hospital, was such that nothing could be done to save his life. Nevertheless, the attending physician and staff did everything they could to afford relief to decedent, and these measures might even have saved his life if he had been so ministered to immediately after leaving the track. The diagnosis was sunstroke, and decedent died at about 6:30 p.m.

So far as the record shows, no man connected with the section gangs at the time decedent left his work had ever seen a case of sunstroke. The men who were laborers on that section gang, including the foreman of the extra gang in which decedent worked, were uneducated men. They were all men who had had very little educational opportunity. Their testimony shows this lack of education on the part of all.

The action was brought by the decedent's mother under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq.

At the close of plaintiff's case, defendant moved for a directed verdict. The defendant stated as grounds for the motion: (1) that no failure of treatment of an ill employee is actionable under the Federal Employers' Liability Act unless the negligence or omission is occasioned by acts in furtherance of interstate commerce; (2) that the evidence does not contain facts showing liability on the part of defendant for the death of plaintiff's decedent; (3) that there is no liability under the Federal Employers' Liability Act for pain and suffering where the injury sustained in the first instance was not the proximate result of defendant's negligence; and (4) that the evidence does not show any definite amount of contribution by decedent to his father and mother and the family of their household.

The motion was overruled. At the close of the whole case, the motion was renewed and it was again overruled. The jury returned a verdict in favor of plaintiff. Thereafter defendant filed a motion for judgment notwithstanding the verdict, or, in the alternative, to set aside the judgment and grant a new trial. That motion was overruled in its entirety.

Judgment was entered for plaintiff upon the verdict and this appeal has resulted.

The proposition of law which governs the determination of this case is well stated in Gypsy Oil Co. v. McNair, 179 Okl. 182, 64 P.2d 885, 892, as follows:

"The question of whether or not an admitted or clearly established state of facts does, or does not, show that a

sick or injured employee is in such a serious condition as to cast upon the employer the duty of furnishing him prompt medical treatment, is also one of law for the court's determination. To bring a case within the rule casting such duty upon the master, it must be shown, or there must be evidence fairly tending to show, that the stricken employee will suffer loss of life or serious bodily harm unless such aid is provided and that the employer or his agent actually had, or by the exercise of due care would have had, notice thereof."

See also Cortes v. Baltimore Insular Line, 287 U.S. 367, 53 S.Ct. 173, 77 L.Ed. 368.

The parties are in agreement this is the law. The proposition is stated at 56 C.J. S., Master and Servant, § 162, p. 815, as follows:

"Where in the course of his employment a servant suffers serious injury or is suddenly stricken down in a manner indicating immediate and emergent need of aid to save him from death or serious harm, the master, if present, is bound to take such reasonable measure or make such reasonable effort as may be practicable to relieve him even though the master is not chargeable with fault in bringing about the emergency or the injury occurred through the employee's own negligence."

Liability upon an employer for failing to provide medical attention, for the illness of an employee stricken while working, can be established by showing that an emergency exists; that the emergent condition is such that the employee is in immediate danger of loss of life or of great bodily harm; and that the employer has knowledge, actual or constructive, of the emergency and all its elements, above stated.

That there was an emergency from the time decedent left the track cannot be doubted. That the emergency was immediate and that there was danger of loss of life or of great bodily harm to the stricken employee is fully established by the evidence.

That which remains for determination is whether the defendant, through its employees, had, or should have had, knowledge of the emergent condition of decedent before medical attention for him was sought by them. It stands as a fact that when decedent was first taken to a doctor it was too late for any attention to benefit him.

Defendant's liability, if any, must rest upon negligence, and the possible negligence of defendant could be only failure to afford medical attention, because of knowledge with which it is charged, when it should have done so.

The testimony of the track laborers was in substance as stated above as to facts in the case.

The foreman in charge of the work being done at the time by several different gangs, as they are called, testified that he had under his general supervision about 85 men working up and down the track, in gangs of twelve or fourteen men, each gang being some distance from the others. The gang in which decedent was working had an immediate foreman in charge of the work, who was known as an extra gang foreman. His work was done under the general foreman in charge of all the gangs.

The man in immediate charge of the gang in which Filemon Rival worked testified in substance that the decedent told him that he was sick, and that he, the foreman, promptly took him to the shade of an outhouse; that at the time Filemon was breathing heavily and the foreman offered him some water, but it was refused; then thinking that the shade of the little outhouse was not enough, he walked Filemon across the highway to a place where there was a bunch of trees, and laid him in the shade; that before he took the boy to the shade of the trees he called for the general foreman to pick up Filemon and take him to a doctor; that after putting the boy in the shade he went back to his work at the track; that he continued to keep a good watch on Filemon; that after the men had made about two pulls on the lining bars, requiring a very short time, he saw Filemon rolling towards the highway, getting up and sitting down, and lying on his stomach, and rolling; that he ran over to him; at that time the general foreman, with some others, arrived with a pickup truck; that they immediately took Filemon to the doctor's office about 700 feet distant; that Filemon's sickness came on at about three p. m.; that he had a watch but did not look at it, but estimated the time at three p. m. because of the work which had been done by the crew, partly one place and then another, before Filemon got sick; and that only about eight or nine minutes elapsed from the onset of illness until the general foreman took Filemon to the doctor's office.

The general foreman testified that his first knowledge that decedent was ill came at approximately three p. m.; that at that time he was working on a crossing just south of the depot at Dexter, while decedent's gang was about 500 feet south of the crossing, about 700 feet from the office of a doctor; that he immediately got a pickup truck and drove to where Filemon was rolling about, at a place about 300 feet west of the railroad track; that Filemon was placed in the truck, being violent at the time, and taken to Dr. Hubbard; that he left Filemon with Dr. Hubbard and his son, Jack Hubbard; that at that time Filemon was not violent; that he went to Filemon immediately after learning that he was ill.

■ Appellant argues that even the foreman would not have been able to rec-

ognize sunstroke at the beginning of decedent's illness, or probably at all. We are not impressed by that argument. Any attack of illness suffered by an employee, while working, of which the employer knows or should know and which places him in danger of loss of life or great bodily harm, would cast upon the employer the duty of promptly affording medical attention.

■ From the statement of the facts made earlier in this opinion, and that above stated as to the testimony of the immediate foreman and the general foreman, it is apparent that there was such a conflict of testimony that no mistake was made by the court in submitting the issue of negligence to the jury. That there was negligence on the part of defendant employer is established by the verdict of the jury.

The second proposition submitted by appellant is that the testimony does not show that the negligence of the defendant was the proximate cause of the death of Filemon Rival.

Decedent's temperature was taken orally by Dr. Hubbard. The thermometer registered 110°, the highest mark on that thermometer.

Dr. Rivas of Belen described very plainly the symptoms of sunstroke, all of which Filemon had exhibited after he became ill. Dr. Rivas told also of the treatment indicated in the case of sunstroke. Dr. Rivas testified the moving or flailing of decedent's arms and other motions he made while sitting by the outhouse, and until he was picked up, were indications of being distressed, in need of help; that an emergency existed; that something was wrong to the extent that, without medical attention, he might be in danger, at least, of serious bodily harm.

After a time lapse—of an hour or more, according to some witnesses, and of only eight or nine minutes, according to other witnesses—he was taken to a doctor in such condition that it is necessarily inferable that nothing could have been done for him at that time.

■ The testimony of Dr. Rivas shows further that a patient properly treated at the time cramping first sets in will probably recover his normal health; that delay of treatment will usually be fatal to the patient or, if there is physical recovery, the patient will suffer permanent brain injury. Both Dr. Rivas, a witness for plaintiff, and Dr. Carr of Albuquerque, a witness for defendant, testified to having seen patients very seriously ill of sunstroke, Dr. Rivas having treated one patient in New Mexico whose temperature went above 108° and who recovered completely, and Dr. Carr having seen eight cases, treating six of them, in five of which the patients died, and in one the patient recovered but suffered serious brain damage. Both of these doctors testified that, when the temperature went this high, death was most likely, but

if there were physical recovery, there might be permanent brain damage. No one can say, assuredly, that a patient treated immediately after cramps being suffered in the case of sunstroke, will recover. All that the law requires is that there be a probability that, where earlier treatment is administered, there will be recovery. Mere possibilities will not suffice. It is unnecessary that we find from the testimony in this case that decedent would necessarily have recovered if treated immediately after cramping set in, but there must be a showing of such a condition that it may be concluded that treatment reasonably administered would have resulted in the patient's recovery.

In this case, the work done by decedent since his return to his home was such that it required a man of real strength to perform his undertakings. He worked on ranches; he hauled wood; and he had worked a few days with the section gang before he was stricken. He had been in the armed services of his country. This required for entrance that his physical condition be good, and there is no evidence in this record that his physical condition was in any way impaired by his service. There is also in the record a report of physical examination made at the hospital at Roswell upon his admission there. The report shows that the man, except for the effects of the sunstroke of which he was then dying, was in good physical condition. No organic trouble of any kind appeared to exist and there were no physical abnormalities.

We conclude that the reasonable probability is that, if decedent had been given medical attention promptly after he began to flail about his arms and was unable to care for himself, he would have recovered. It seems that there was capable medical assistance only 700 feet distant from the place where he was stricken. The testimony in the record, as given by Dr. Hubbard of Dexter, indicates that this physician was perfectly capable of taking care of the man in the early stages of his illness. It seems likely that if he had had prompt treatment at the time he was sitting by the outhouse, at the time his immediate foreman says he was keeping his eye on him, he would have recovered. We think that the requirements as to the issue of proximate cause in this case were fully met; and we hold that the conclusion of the jury, that the proximate cause of the death of Filemon Rival was the negligent failure of defendant, through its servants, to afford Rival medical attention when he should have had it, should be upheld.

Appellant's Point Three is the claim that damages are not recoverable for pain and suffering unless the defendant is responsible for "the initial injury", and not at all where the patient was unconscious.

The rule is stated that if the employee lives for any appreciable length of

time there may be recovery by the beneficiaries for the pain and suffering endured by him while conscious. Appellant seems to assume that under no circumstances could there be recovery for pain and suffering until decedent reached the office of Dr. Hubbard, at which time he was "out of his mind", and so there can be no recovery. This argument assumes that the company was without knowledge and should not be charged with knowledge of the emergency until decedent was picked up under the trees while rolling, and taken to the doctor's office. We think, however, that while the man was sitting by the outhouse, and under the trees, and was evidently suffering from cramps, that he was certainly enduring pain. All of the doctors testified that cramps in sunstroke would cause severe pain. So we think it is unnecessary to discuss further the question of whether decedent was conscious of pain and suffering.

If appellant intends by the use of the term "initial injury" to mean that appellant could not be responsible for damages for pain and suffering in any case unless it was responsible for the accident or illness itself, then there would be no possibility of ever recovering for pain and suffering due to negligent failure to afford medical assistance when an employer knows or should know that an employee is in an emergent condition. This is not the law. See Anderson v. Atchison, T. & S. F. Ry. Co., 333 U.S. 821, 68 S.Ct. 854, 92 L.Ed. 1108, and cases cited. In an attempt to support its contention with authority, appellant cites Tishar v. Nicodemus, D.C., 49 F.Supp. 145, where the term "initial injury" appears. The use there is not in harmony with the interpretation sought to be placed upon it here by appellant. In addition, the case went off on a motion to dismiss the complaint for failure to state a cause of action. The motion was sustained and the complaint dismissed. There is nothing in the case which could possibly have any bearing upon the factual situation in the case at bar.

Appellant's Points Four and Seven raise the same proposition of law. They deal with the submission to the jury of the question of pecuniary damages, and of the giving of any instructions with reference to pecuniary damages, on the claim that there is no evidence in the record sufficient to be a basis for a recovery of damages by the plaintiff, mother of decedent.

We have already pointed out elsewhere that decedent spent his time, when not working for wages, in working for his parents, and that he gave to his mother, for the benefit of his parents' household, all his earnings. He was unmarried and had no children. As a member of the family, he received from his mother only such money as was necessary for his personal needs. The parents had the major portion of his earnings and as far as the record shows had reasonable expectations of continuing so to have.

Appellant cites authorities holding that pecuniary loss will be presumed for a widow and minor children, but that as to others it must be established by proof in order to justify a recovery. There is ample proof that there was pecuniary loss to decedent's parents by reason of his death. The contention of appellant, going further, is that there was no proof of a definite sum regularly contributed to the parents and so there can be no recovery. Appellee points out, however, that it is not required as to parents that there be proof of a definite sum contributed monthly by a deceased child, but only that they had a reasonable expectation of pecuniary loss by reason of the death of the child. The general rule is stated at 25 C.J.S., Death, § 26:

"Under most statutes giving a right of action for death by wrongful act to or for the benefit of designated beneficiaries, pecuniary or material loss to such beneficiaries by reason of the death and consequent upon the relationship between them and deceased is essential to the recovery of any compensation; this is the rule, for example, in actions brought under the Federal Employers' Liability Act. A pecuniary loss, however, need not be definitely and exactly established; it is sufficient that the beneficiary should have had some reasonable expectation of pecuniary benefit, assistance or support of which he has been deprived by the death. The existence of such a reasonable expectancy is not a matter of guess or conjecture but, at least to the extent that it is not presumed, must be grounded on reasonably continuous past acts or conduct of deceased."

The rule just quoted is pertinent to any consideration of damages, whether under the Federal Employers' Liability Act or the common law. See also Gonzales v. Chino Copper Co., 29 N.M. 228, 222 P. 903; Moffett v. Baltimore & Ohio Ry. Co., 4 Cir., 220 F. 39

Points Four and Seven are without merit. What has been stated also governs the disposition of Point Nine, having to do with an instruction on pecuniary damages, which is without merit.

Appellant's Points Five and Eight submit the proposition that the court erred "in permitting the case to go to the jury because the charge of failure to render aid to an employee stricken ill under the circumstances of this case is not an omission or neglect of duty in furtherance of, or incidental to, interstate commerce."

Appellant cites one case, Metzger v. Western Maryland Ry. Co., 4 Cir., 30 F.2d 50, where an injured employee charged negligence on the part of the company doctor who treated him, and it was held that while under treatment he was not engaged in interstate commerce. As appellee points out, this case was decided in 1929. In 1939

the Act was amended to do away with the "moment of injury" doctrine, and established the rule that any employee ordinarily engaged in work affecting interstate commerce and subject to the Act, was entitled to the benefits of the Act. O'Donnell v. Pennsylvania Ry. Co., D.C., 122 F.Supp. 899. There can be no doubt that Filemon's gang was engaged in repairing the track of an interstate railroad and in aid of interstate commerce at the time he was taken ill. All modern authority requires that this point be ruled against appellant. See Rivera v. Atchison, T. & S. F. Ry. Co., 61 N.M. 314, 299 P.2d 1090.

Point Six claims that a motion for mistrial should have been sustained. It is claimed that appellee's attorney, during argument to the jury, made some inflammatory remarks concerning suffering and anxiety.

There is nothing in the record to show the nature of the remarks upon which the motion is based and we have no way of knowing what these remarks may have been.

The trial court knew what the remarks were and gave due consideration to the motion and overruled it. This was a matter within the discretion of the court. We will not disturb the ruling of the court. Griego v. Conwell, 54 N.M. 287, 222 P.2d 606.

Point Ten asserts: "For all the reasons outlined under Points VI to IX inclusive, the court erred in not granting the defendant a new trial as an alternative to their requested directed verdict or judgment notwithstanding the verdict." Since we have agreed with the trial court as to Points Six through Nine, we must hold that Point Ten is without merit.

The judgment of the lower court should be affirmed. It is so ordered.

LUJAN, C. J., and SADLER, McGHEE and COMPTON, JJ., concur.