619 P.2d 826

**Janet SALAZAR, as Personal Representative of the Estate of her Fetus, Plaintiff–Appellant,**

v.

**ST. VINCENT HOSPITAL, Eric C. Wolf, Kenneth Harrold, M.D., and Northern New Mexico Emergency Medical Services, P.C., Defendants–Appellees.**

No. 4111.

Court of Appeals of New Mexico.

April 3, 1980.

Rehearing Denied April 14, 1980.

Writ of Certiorari Quashed Sept. 30, 1980.

Daniel W. Shapiro, Ortega & Snead, P. A., Albuquerque, for plaintiff–appellant.

Richard C. Civerolo, Carl J. Butkus, Civerolo, Hansen & Wolf, P. A., Albuquerque, for defendants–appellees St. Vincent Hospital and Eric C. Wolf.

Thomas A. Simons, IV, Sommer, Lawler, Scheuer & Simons, P. A., Santa Fe, for defendants–appellees Kenneth Harrold, M.D. and Northern New Mexico Emergency Medical Services, P.C.

OPINION

WOOD, Chief Judge.

Plaintiff, individually sought damages for the alleged negligence and malpractice of defendants in taking care of her vaginal bleeding. Those claims are not involved in this appeal. Plaintiff, as personal representative of the estate of her fetus, sought damages for the wrongful death of the fetus. The trial court dismissed the wrongful death claims on the basis that they

failed to state a claim upon which relief could be granted. Such a dismissal, under R.Civ.Proc. 12(b)(6), requires an acceptance, as true, of all facts well pleaded. *Runyan v. Jaramillo*, 90 N.M. 629, 567 P.2d 478 (1977). The second amended complaint alleges the "fetus was aged more than thirty weeks of gestation, was a viable fetus, and was alive at the time" of the alleged negligence and malpractice. Viability being accepted as true for the purpose of dismissing the wrongful death claims, there is no question of viability or its implications in this appeal. See generally, *Presley v. Newport Hospital*, 117 R.I. 177, 365 A.2d 748 (1976). The issue is whether damages may be recovered, in New Mexico, for the wrongful death of a viable fetus. On this subject generally, see Annot., 15 A.L.R.3d 992 (1967).

*Common Law*

■ By Laws 1875–76, ch. 2, § 2 "the common law as recognized in the United States of America, shall be the rule of practice and decision." Section 38–1–3, N.M.S. A.1978. Faced with the meaning of "as recognized" and "in the United States", *Browning v. Est. of Browning*, 3 N.M. 659, 9 P. 677 (1886) held:

> [T]he legislature intended by the language used in that section to adopt the common law, or lex non scripta, and such British statutes of a general nature not local to that kingdom, nor in conflict with the constitution or laws of the United States, nor of this territory, which are applicable to our condition and circumstances, and which were in force at the time of our separation from the mother country.

Speiser, *Recovery for Wrongful Death 2d* (1975) § 1:1 states that the common–law rule denying a right of recovery for wrongful death "derives from a dictum of Lord Ellenborough in the case of *Baker v. Bolton*", 1 Camp. 493, 170 Eng.Rept. 1033 (1808). *Moragne v. States Marine Lines*, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970) comments that the "first explicit statement of the common–law rule against recovery for wrongful death came in ...

*Baker v. Bolton*," supra. If the statements in *Speiser*, supra, and *Moragne*, supra, are correct, then it may be doubted that the common–law rule existed in New Mexico; *Baker v. Bolton*, supra, was decided in 1808, which was after our separation from the "mother country." However, Smedley, *Wrongful Death–Bases of the Common Law Rules*, 13 Vand.L.Rev. 605 (1960), indicates that the statements in *Speiser*, supra, and *Moragne*, supra, are incorrect.

Malone, *The Genesis of Wrongful Death*, 17 Stan.L.Rev. 1043 (1964–65), points out that the common–law rule was an ancient one. Doubts as to the applicability of the rule, in New Mexico, were foreclosed by *Ickes v. Brimhall*, 42 N.M. 412, 79 P.2d 942 (1938). *Ickes* affirmed the existence of the common–law rule in New Mexico: "And, except as superseded or abrogated by statute or constitution, or held to be inapplicable to conditions in New Mexico, the common law remains the rule of practice and decision."

There having been no right of recovery for wrongful death by the "common law" defined in *Browning v. Est. of Browning*, supra, the parties dispute whether there is a right of recovery for the wrongful death of a fetus under the New Mexico wrongful death statute.

*The Statute*

A right of recovery for wrongful death was enacted by Laws 1882, ch. 61, § 2. Laws 1891, ch. 49, § 1 amended the 1882 law. This 1891 amendment carried forward the substance of Section 2 of the 1882 Act. *Stang v. Hertz Corporation*, 81 N.M. 69, 463 P.2d 45 (Ct.App.1969), aff'd, 81 N.M. 348, 467 P.2d 14 (1970). This 1891 amendment also added an additional phrase. The statute, after the 1891 amendment, appears as § 41–2–1, N.M.S.A.1978. It reads (the phrase added by the 1891 amendment is emphasized):

> Whenever the death of a person shall be caused by the wrongful act, neglect or default of another, *although such death shall have been caused under such circumstances as amount in law to a felony*, and the act, or neglect, or default, is such

as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then, and in every such case, the person who, or the corporation which, would have been liable, if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured.

■ Plaintiff contends this statute was general, prospective and remedial. We agree; the statute provides for recovery "in every such case . . . notwithstanding the death of the person injured." The emphasized language, added by the 1891 amendment, expressly repudiates one of the reasons advanced for denying recovery at common law—that there could be no recovery for an act that constituted both a tort and a felony because the tort was less important than the offense against the Crown, and the tort either merged into, or was preempted by the felony. *Moragne v. States Marine Lines*, supra.

This general, prospective and remedial statute, by its language, applied to the death of a "person". The only issue as to the applicability of the statute, in this case, is whether "person", as used in the statute, included a viable fetus.

Was a viable fetus a person at common law, using "common law" as defined in *Browning v. Est. of Browning*, supra? As to tort cases, there was no recovery for wrongful death. See Blackstone's Commentaries, Book 3 (Lewis's Edition, 1902) page 119. Thus, there was no issue as to whether there could be recovery for the wrongful death of a fetus. As to the protection the common law extended to the property interests of an unborn child, the vesting of the property interest seems to have depended on the child being born alive. *Doe v. Clarke*, 2 H.Bl. 399, 126 Eng. Rept. 617 (1795); *Beale v. Beale*, 1 P.Wms. 244, 24 Eng.Rept. 373 (1713); Winfield, *The Unborn Child*, 8 Cambridge L.J., page 77 (1944); *Roe v. Wade*, 410 U.S. 113 at 162, 93 S.Ct. 705 at 731, 35 L.Ed.2d 147, 93 S.Ct. 705 (1973). This same approach was applied in interpreting Lord Campbell's Act. The

George and Richard, The Law Reports, Volume III, Admiralty and Ecclesiastical Cases, 466 at 480 (1871).

As to criminal cases, *Bracton*, writing early in the 13th century, stated the killing of a quick fetus was homicide. 2 Bracton, *De Legibus Et Consuetudinibus Angliæ* (Twiss ed. 1879) page 279 states: "If there be some one, who has struck a pregnant woman, or has given her poison, whereby he has caused abortion, if the fœtus be already formed and animated, and particularly if it be animated, he commits homicide." However, Means, *The Phoenix of Abortional Freedom: Etc.*, 17 N.Y.L.F. 335 (1971), reviews common law decisions and common law legal texts, and this review is to the effect that the killing of a fetus at common law whether or not viable was not a crime of any kind, that *Bracton* was in error in declaring the killing to be a felony, and other writers were in error in declaring the killing to be a crime short of a felony. *Roe v. Wade*, supra, at 134, 93 S.Ct. at 717, states: "Whether abortion of a *quick* fetus was a felony at common law, or even a lesser crime, is still disputed."

In light of the foregoing, our decision is not based on the status of a fetus at common law, as defined in *Browning v. Est. of Browning*, supra, and plaintiff does not contend that it should be.

Plaintiff claims that "person" in § 41-2-1, supra, includes a viable fetus, that the status of a viable fetus as a "person" has been established by "contemporary common law through legal and social evolution". This approach, of giving a contemporary meaning to the words of a statute, was followed in *O'Neill v. Morse*, 385 Mich. 130, 188 N.W.2d 785 (1971). See also the approach of the dissenting opinion in the criminal case of *Keeler v. Superior Court of Amador County*, 2 Cal.3d 619, 87 Cal.Rptr. 481, 470 P.2d 617 (1970). Although not specifically stated, this seems to have been the basis for decision in a great many of the states which held that a viable fetus was a "person" or "minor child". See cases cited in footnote 4 in *Justus v. Atchison*, 19 Cal.3d 564, 139 Cal.Rptr. 97, 565 P.2d 122

(1977), and in footnote 35 in *Speiser*, supra, § 4:36. Plaintiff argues that such an approach does no more than carry out the intent of the enacting legislature, which was to provide a damage recovery in order to protect human life and deter behavior that destroys such life.

■ We do not answer plaintiff's argument in detail. To construe legislation on the basis of contemporary meanings of words used by the enacting legislature would make a mockery of legislative intent; legislative intent would change as new meanings were given to the statutory wording. Our function is to give effect to the legislative intent; "A statute should be interpreted to mean what the Legislature intended it to mean". *State ex rel. Newsome v. Alarid*, 90 N.M. 790, 568 P.2d 1236 (1977). "A statute is to be interpreted as the legislature understood it at the time it was passed." *Pan American Petroleum Corp. v. El Paso Nat. Gas Co.*, 82 N.M. 193, 477 P.2d 827 (1970). Accordingly, we reject plaintiff's "contemporary meaning" approach.

■ Whether a viable fetus is included within the word "person" in § 41–2–1, supra, is to be determined on the basis of the intent of the enacting legislature in 1882 inasmuch as the 1891 legislature made no change in the usage of "person".

*Bettini v. City of Las Cruces*, 82 N.M. 633, 485 P.2d 967 (1971) states: "We must presume that the legislature was informed as to existing law, not only statutory law, but common law." The legislature's knowledge of the common law, in 1882, could not have been that no protection was accorded a fetus. The article by *Means*, supra, was not published until 1971. The legislative knowledge would have been that the killing of a quick fetus under the common law was a "heinous misdemeanor." Blackstone's Commentaries, Book 1 (Lewis's Edition, 1902) page 130. Nevertheless, in this appeal, the knowledge of the common law that we attribute to the 1882 legislature is that no protection had been accorded a fetus.

In determining whether the 1882 legislature intended that a viable fetus was included within "person", the statutory law is dispositive. Laws 1853–54, Act 28 is entitled "*Defining Crimes and Punishments.*" Chapter III of Act 28 is headed "*Of Offences Against Lives and Persons.*" The following two sections are a part of Chapter III:

Sec. 10. The willful killing of an unborn infant child, by any injury to the mother of such child, which would be murder if it resulted in the death of such mother, shall be deemed murder in the third degree.

Sec. 11. Every person who shall administer to any woman pregnant with a quick child, any medicine, drug, or substance whatever, or shall use or employ any instrument or other means, with intent thereby to destroy such child, unless the same shall have been necessary to preserve the life of such mother, and shall have been advised by a physician to be necessary for such purpose, shall, in case the death of such child or such mother be thereby produced, be deemed guilty of murder in the third degree.

These two sections were in effect in 1882; they appear in Compiled Laws 1897 as §§ 1073 and 1074. The first change in these laws occurred in 1907. Laws 1907, ch. 36, § 23 repealed Compiled Laws 1897, §§ 1073 and 1074. However, that same 1907 law, in §§ 5 and 6 reenacted the above–quoted statutes, with one change. The change upgraded the offenses from third degree to second degree murder. Laws 1907, ch. 36, § 5 codified in Code 1915 as § 1463 was repealed by Laws 1963, ch. 303, §§ 30–1. Laws 1907, ch. 36, § 6 has never been specifically repealed; however, it may have been impliedly repealed by Laws 1919, ch. 4, § 2, a part of a new abortion statute. The discussion in *Roe v. Wade*, supra, at pages 138–39, 93 S.Ct. at 719–20, concerning American law, is not a statement of New Mexico law.

From 1854 until 1919, New Mexico's public policy, stated in legislation, was that a viable fetus was protected by criminal laws declaring a violation to be murder. The protection was in legislation which dealt with offenses against "lives and persons."

The knowledge of statutory law that we attribute to the 1882 legislature is that a viable fetus was protected by legislation dealing with lives and persons.

What does criminal law protection of a viable fetus have to do with a civil action for the wrongful death of that fetus? Under the common law, as defined in *Browning v. Est. of Browning*, supra, civil liability evolved from the criminal law. "Our earliest examples seem all to be cases of undoubted violence with a strong criminal element. The plaintiff has been beaten, wounded, chained, imprisoned, starved, carried away to a foreign country, and has suffered many 'enormities'." Plucknett, *A Concise History of the Common Law*, (5th ed. 1956) at 465. The transition was from a deliberate assault to accidental injury to technical assault. *Plucknett*, supra, at 466.

Kearny Code of Laws (1846), *Courts and Judicial Powers*, § 24 recognized actions for trespass and trespasses on the case for "injuries to persons". The original nature of trespass, as opposed to trespass on the case, was for deliberate acts. *Plucknett*, supra, at 465. The Kearny Code recognized actions for civil liability for willful and intentional criminal conduct, such as that prohibited by Laws 1853–54, Act 28, Chapter III, §§ 10 and 11. Concerning civil liability based on criminal conduct, *Colbert v. Journal Publishing Co.*, 19 N.M. 156, 142 P. 146 (1914) states: "[A] wrongful act punishable as an offense, does not preclude exemplary damages therefor in a civil act sounding in tort." *Colbert*, supra, is consistent with the civil liability for a criminal law violation discussed in *Plucknett*, supra.

In 1882, the wrongful killing of a viable fetus was a criminal offense. In 1882, civil liability existed for the commission of a criminal offense. That which was missing was a remedy. *Moragne v. States Marine Lines*, supra, states:

Where existing law imposes a primary duty, violations of which are compensable if they cause injury, nothing in ordinary notions of justice suggests that a violation should be nonactionable simply because it was serious enough to cause

death. On the contrary, that rule has been criticized ever since its inception, and described in such terms as "barbarous." ... Because the primary duty already exists, the decision whether to allow recovery for violations causing death is entirely a remedial matter.

The legislature of 1882 intended to provide a remedy "in every such case ... if death had not ensued". Section 41–2–1, supra. In light of existing statutory provisions at the time of the enactment of § 41–2–1, supra, we hold the legislature of 1882 intended to provide a right of recovery for the wrongful death of a viable fetus. Compare *Eich v. Town of Gulf Shores*, 293 Ala. 95, 300 So.2d 354 (1974); *Stern v. Miller*, 348 So.2d 303 (Fla. 1977); *Britt v. Sears*, 150 Ind.App. 487, 277 N.E.2d 20 (1971).

*A Current Common–Law Right*

If our 1882 statute did not provide a remedy for the wrongful death of a viable fetus, then we could not say that the 1882 legislation was intended to occupy the entire field of recovery for wrongful death. See *Justus v. Atchison*, supra. Why? Because under *Ickes v. Brimhall*, supra, the common–law rule remains "except as superseded or abrogated by statute or constitution". Thus, there would be no statute dealing with this remedy. In such a situation it would be appropriate to hold that the common–law rule, which barred recovery, was no longer applicable to our conditions and circumstances, see *Browning v. Est. of Browning*, supra. In such a situation we would hold that the remedy now exists. However, having held that the remedy exists under § 41–2–1, supra, it is unnecessary to discuss this approach in detail.

For changing conditions see: *Hicks v. State*, 88 N.M. 588, 544 P.2d 1153 (1975); *Maestas v. Overton*, 87 N.M. 213, 531 P.2d 947 (1975); *Rodgers v. Ferguson*, 89 N.M. 688, 556 P.2d 844 (Ct.App. 1976); *Flores v. Flores*, 84 N.M. 601, 506 P.2d 345 (Ct.App. 1973); see *Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980); *Moragne v. States Marine Lines*, supra.

For development of a common–law remedy for injuries which caused the death of a viable fetus see: *Justus v. Atchison*, supra, concurring opinion of Justice Tobriner; *Rainey v. Horn*, 221 Miss. 269, 72 So.2d 434 (1954); *Gaudette v. Webb*, 362 Mass. 60, 284 N.E.2d 222 (1972).

The order dismissing the wrongful death claims is reversed. The cause is remanded with instructions to reinstate the wrongful death claims.

IT IS SO ORDERED.

LOPEZ, J., concurs.

SUTIN, J., dissents.

SUTIN, Judge (dissenting).

I dissent.

Plaintiff sued defendants in four counts. Count I was stated in negligence and malpractice in which plaintiff sought damages in the amount of $100,000.00 because plaintiff's viable fetus was born dead. Count II sought recovery of a pecuniary loss in the sum of $300,000.00 to the fetus' estate caused by wrongful death of the fetus. Count III sought damages to plaintiff in the sum of $100,000.00 for medical malpractice, and Count IV sought $300,000.00 damages for medical malpractice which caused the death of the fetus.

Counts II and IV were dismissed with prejudice for failure to state a claim upon which relief could be granted. The judgment should be affirmed.

We are confronted with a matter of first impression.

A. *Introduction.*

The judicial controversy surrounding the validity of a claim for wrongful death of an unborn child is prevalent in the United States. The cases are collected in Annot. *Right to Maintain Action or to Recover Damages for Death of Unborn Child*, 84 A.L.R.3d 411 (1978).

Law review articles, notes and comments are plentiful: Reilly, *Torts–Wrongful Death–a Viable Fetus is a "Person" for Purposes of the Rhode Island Wrongful Death Act*, 46 University of Cincinnati L.Rev. 266 (1977); Houk, *Torts–Wrongful Death–Right of Action for the Wrongful Death of a Viable Fetus in Tennessee– Recent Decision and Statutory Response*, 45 Tenn.L.Rev. 545 (1978); Hartye, *Tort Recovery for the Unborn Child*, 15 Journal of Family Law, 276 (1976–77); Cherken, Jr., *Torts–Wrongful Death–Recovery for Wrongful Death of a Stillborn Fetus Examined*, 21 Villanova L.Rev. 994 (1975–76); Denton, *Torts: Recovery for Prenatal Injury and the Wrongful Death of a Stillborn Fetus*, 8 Tulsa L.J. 84 (1972); Maledon, *The Law and the Unborn Child: The Legal and Logical Inconsistencies*, 46 Notre Dame Lawyer 349 (1971); Miller, *No Recovery for Injury to a Viable Fetus which is Stillborn*, 36 Ins. Counsel J. 92 (1969); Gordon, *The Unborn Plaintiff*, 63 Mich.L.Rev. 579 (1965); Del Tufo, *Recovery for Prenatal Torts: Actions for Wrongful Death*, 15 Rutgers L.Rev. 61 (1960); *Torts–Wrongful Death– Unborn Child*, 70 Mich.L.Rev. 729 (1972); Segal, *Wrongful Death and the Stillborn Fetus–A Current Analysis*, 7 Houston L.Rev. 449 (1970); Norman, *Torts: Prenatal Injuries–Viability and Live Birth*, 21 Okla. L.Rev. 114 (1968); Wenger, *Developments in the Law of Prenatal Wrongful Death* 69 Dickinson L.Rev. 258 (1965); Muse–Spinella, *Right of Infant to Recover for Prenatal Injury*, 36 Va.L.Rev. 611 (1950), and many more.

*Gordon, supra*, set the stage for the intense judicial controversy that exists today. He wrote:

To Religion and Medicine, life begins at conception; but to Law legal personality begins only at birth. This jurisprudential concept is the origin of much of the difficulty. [Id. 581.]

\*     \*     \*     \*     \*     \*

Law requires some definitive clear cut lines, particularly one which heralds the beginning of legal personality. [Id. 593.]

Strong disagreement exists between courts of different states and between members of many courts of each state. Disagreement began in the 20th century

and views have changed. Erudition, wisdom and analysis are found in opposing views.

Courts which grant a right of action to a representative for the death of an unborn child have redefined the word "person" as commonly understood in the 19th century when wrongful death statutes were enacted. Through the biological process, a "person," "child," "minor child" was held to include a viable fetus which had a separate existence of its own. By a legal fiction or indulgence, a legal personality was imputed to an unborn child by medical science because birth is an artificial and unreasonable demarcation of a right of action.

Opposing views prefer legislative enactments that amend the wrongful death statute to include "fetus, viable fetus or unborned child."

Were amendments of this nature enacted in the States of the Union, the controversy would end. In the conclusion of the Villanova Law Review article, *supra, Cherken, Jr.,* wrote:

> . . . It is submitted that the word "person" should be deleted from the wrongful death statutes and replaced by the phrase "fetus, infant or adult." Such an expansion would comport with the view that there are protected interests in potential life which exist throughout the various stages of human development prior to birth, and would bring clarity and consistency to this turbulent area of tort law. [Id. 1005.]

In 1978, Tennessee amended its act. Pub. Acts, ch. 742; § 1:

> "For purposes of this section, the word 'person' shall include a fetus which was viable at the time of injury. A fetus shall be considered viable if it had achieved a stage of development wherein it could reasonabley [sic] be expected to be capable of living outside the uterus."

In 1917, the Missouri Children's Code Commission proposed the adoption of a provision for recovery of prenatal injuries but the proposal was not adopted by the Missouri legislature. *Gordon, supra,* [p. 586].

Whether judicial legislation is preferable to legislative enactment is the controlling factor in this interminable dispute. Judicial legislation is subject to change by the courts. Legislative enactment is subject to change by the representatives of the people.

A "person" is a living human being in *esse.* A "fetus" is a developing human being *in posse* which means "that which is not, but may be." "A child before birth is *in posse;* after birth, *in esse.*" Black's Law Dictionary, p. 894 (Rev. 4th Ed. 1968).

Whether a right of action should be granted an unborn child is a legislative function, not a judicial function. By use of the judicial function, we create an illusion of the kind of law which we desire to have rather than what the law is as enacted by the legislature. For that reason, we have strong, consistent disagreements with reference to the right of action in an unborn child.

Strong reasons of public policy have been urged for and against allowing the new right of action. But those reasons which have suggested a right of recovery do not so far outweigh those which deny the right as to call for judicial legislation on the question.

B. *Historical perspective.*

History is a teacher that is not to be ignored.

Our wrongful death statutes were enacted in 1882. Prior thereto, the territorial legislature had knowledge of "Offenses Against Lives and Persons" enacted under Chapter III, Art. 28 of the Laws of 1853–54. Sections 10 and 11 included criminal offenses relative to an "unborn infant child" and "quick child." The legislature knew of prenatal criminal law in which an "unborn infant child" and "quick child" were included within the meaning of "Person." When the wrongful death statutes were enacted, the legislature omitted any reference to an "unborn child." It used terminology such as "deceased person," "child or children of the deceased child," "minor and unmarried," and "deceased has reached the age of majority and is unmarried."

In 1884, Justice Holmes wrote the opinion in *Dietrich v. Northampton*, 138 Mass. 14, 52 Am.R. 242 (1884). A woman four or five months pregnant was delivered of a child which survived but a few minutes after an accident. The child was held not to be a "person" within the statute that gave an administrator a cause of action for negligent death. The infant child did not have a *Locus Standi* in court. This conclusion could not be affected by showing that such an infant child was within the protection of the criminal law. *Dietrich* was decided without precedent.

Our wrongful death statutes were amended in 1884 and 1891. With knowledge of the civil and criminal law of the time, the legislature continued to omit any reference to an unborn child. For 96 years, no case involving a right of action for the negligent death of an unborn child reached the New Mexico courts.

The first dispute over this subject matter began in 1900. *Allaire v. St. Luke's Hospital*, 184 Ill. 359, 56 N.E. 638 (1900). Justice Boggs strongly dissented based upon medical science, skill and experience that the viable fetus is a body separate from the mother. For the next 79 years, acrimonious opinions were issued by a majority of the appellate courts of the country. Our legislature did not change its wrongful death statutes.

"Our wrongful death statutes were taken from Missouri and this court has often followed the views of the Missouri Supreme Court in its interpretation of these statutes." *Langham v. Beech Aircraft Corporation*, 88 N.M. 516, 520, 543 P.2d 484 (1975). We should do so again.

The first Missouri case appears to be *Finer v. Nichols*, 158 Mo.App. 539, 138 S.W. 889 (1911) in which the court held that in an action for injuries to a married woman resulting from a miscarriage, loss of the anticipated society of the prospective child and mere matters of sentiment in connection therewith were too remote to form a proper element of damage. In the course of its opinion, the court quoted at length from 1 Joyce on Damages, § 185. The following is a portion thereof:

"Where the miscarriage results in loss of prospective offspring, it would seem that the better reasoning would support the conclusion there can be no recovery for such loss. [Id. 892.]

*Buel v. United Rys. Co. of St. Louis*, 248 Mo. 126, 154 S.W. 71 (1913) involved the penalty portion of the wrongful death statute. The court held that the parents could not recover for the death of a child *after* birth resulting from negligent injuries to it before birth, while the mother was enceinte. *Buel* was overruled in *Steggall v. Morris*, 363 Mo. 1224, 258 S.W.2d 577 (1953). *Steggall* held that where a viable child suffered injuries before birth, was born alive and later died as a result of the injuries, the parents could recover from the tort–feasor for the child's death. A child born was a "person."

Finally, in *State ex rel. Hardin v. Sanders*, 538 S.W.2d 336 (Mo. 1976), the court held that until there has been a live birth, a fetus is not a "person" within the meaning of the Wrongful Death Act. The court said:

... We think the legislature in enacting the original act and subsequent revisions did not intend to create an action for the death of a fetus never born alive. In view of the common law rule that an unborn fetus was not a "person" we think if there had been an instruction to create such an action it would have been specifically so stated. It also seems *significant that in giving the right of recovery to the parents the statute used the phrase "if the deceased be a minor and unmarried." The words "deceased," "minor" and "unmarried" are words that usually, if not always, refer to one who has had some period of life after birth.* [Emphasis added.] [Id. 338–9.]

Section 41–2–3, N.M.S.A.1978 provides for distribution as follows:

First .... *if such deceased be a minor, childless and unmarried,* then to the father and mother, who shall have an equal interest in the judgment .... [Emphasis added.]

Of course, courts that desire to create a right of action in an unborn child have no difficulty in translating "minor child" to include a viable fetus. *Moen v. Hanson*, 85 Wash.2d 597, 537 P.2d 266 (1975). Whether the *Moen* opinion would be affected if the Washington statute read "a minor child unmarried" is a matter of speculation.

The district judge relied on *Hardin*. I agree.

From this historical perspective, we should have no hesitancy in following the views of the Missouri Supreme Court.

C. *A right of action does not exist as a result of the death of an unborn child under the wrongful death statute.*

At the beginning of this century, the Supreme Court held that the administrator of an estate lacked the right to file a complaint under the wrongful death statute. *Romero v. Railroad*, 11 N.M. 679, 72 P. 37 (1903). The court said:

> ... Counsel for appellant contends that this statute is remedial in its nature, and should be liberally construed, but, without concurring in the views of counsel, it is proper to say, that there can be no liberality indulged as would authorize the court in the name of construction to change the plain terms of an *unambiguous statute*, so as to provide a remedy which under the statute does not exist. [Emphasis added.] [Id. 687, 72 P. 37.]

Where the terms of a statute are plain and unambiguous, there is not room for construction. *Hendricks v. Hendricks*, 55 N.M. 51, 226 P.2d 464 (1950). The court said:

> ... It seems too plain for argument that the effort here made is to have us accomplish by judicial construction what in other states has been deemed a proper subject of legislative enactment. ... If a change such as that indicated be needed the legislature and not the courts is the place to go for it. [Id. 66, 226 P.2d 464.]

It has been repeatedly said that statutory words are to be used in their ordinary and usual sense unless the contrary is apparent. *State ex rel. Bird v. Apodaca*, 91 N.M. 279, 573 P.2d 213 (1977). The words "person, child, children, minor child not married," are common or popular words which should be understood in the popular sense. They mean, in sum, a live human being, not an unborn child.

Courts which create a new right of action travel the medical route. They say a viable fetus is a person because it has been put into existence separate from its mother by medical science. To me, "medical existence is not legal existence." Neither can the medical profession create a right of action at law. A seed planted in the earth that grows to the surface and dies cannot become a mighty oak. For serious medical problems involved, see *Gordon, supra.*

I agree with those courts and dissenting opinions of recent date which hold that there is no common—law right of action for tortious killing of a human being; that at common law, an unborn child was not a "person"; that statutes are not to be construed as affecting any change in the common law beyond that which is clearly indicated; that, if possible, statutory enactments should be construed by courts as consistent with the common law; that "person" is clear and unambiguous in its noninclusion of a viable fetus, and that it is a matter for the legislature to expand the statutory definition if it deems it appropriate, not the court. *Kilmer v. Hicks*, 22 Ariz.App. 552, 529 P.2d 706 (1974); *Presley v. Newport Hospital*, 117 R.I. 177, 365 A.2d 748 (1976), 84 A.L.R.3d 391 (1978), Justice Kelleher, dissenting; *State ex rel. Hardin, supra; Justus v. Atchison*, 19 Cal.3d 564, 139 Cal.Rptr. 97, 565 P.2d 122 (1977); *Stern v. Miller*, 348 So.2d 303 (Fla.1977); *Hamby v. McDaniel*, 559 S.W.2d 774 (Tenn.1977); *Egbert v. Wenzl*, 199 Neb. 573, 260 N.W.2d 480 (1977).

Additional serious problems arise which caution us to avoid judicial legislation such as proof of damages, pecuniary injury, problems of double recovery, U.J.I. Instructions, medical knowledge related to the certainty of the time of viability.

With reference to damages for wrongful death, let us review U.J.I. 14.17 except item (1). *Stang v. Hertz Corporation*, 81 N.M. 348, 467 P.2d 14 (1970).

Compensatory damages are not fixed for the loss of life itself but for the loss of pecuniary benefits expected from the continued life of the deceased. In arriving at the amount, "deduction must be made from gross earnings or earning capacity, if any, to cover income taxes, social security taxes" and any other taxes "before the family could expect any pecuniary benefits from the deceased." The jury should consider proof as to age, learning capacity, health, habits and probable duration of life.

To apply this measure of damage to an unborn child would require expert testimony based upon factors from which no evaluation can be made except by way of speculation and possibility. The reasonable expectancy of a pecuniary loss must be grounded *on reasonable continuous past acts or conduct of deceased. Rival v. Atchison, Topeka and Santa Fe Railway Co.*, 62 N.M. 159, 306 P.2d 648 (1957). To allow the jury to speculate and resort to conjecture in the future to prevent an unjust result is sentimental, not legal reasoning. Perhaps the time may come when medical science can reasonably determine the future value of an unborn child.

"Pecuniary injury to a statutory beneficiary is an element to be considered in awarding damages .... Proof of pecuniary injury is not a prerequisite to recovery of damages for wrongful death.... *Damages for the wrongful death may be recovered by proof of the present worth of life of decedent to the decedent's estate.*" [Emphasis added.] *Stang v. Hertz*, 81 N.M. 69, 72, 463 P.2d 45 (Ct.App.1969), aff'd, 81 N.M. 348, 467 P.2d 14, *supra.*

Neither judicial wisdom, expert testimony, nor medical science can create any "present worth of life" to the estate of an unborn child.

Courts that have granted a right of action in an unborn child almost always avoid discussion of the elements and measure of damage, and few cases have effected a result. See 84 A.L.R.3d, pp. 457–8. *Fowler v. Woodward*, 244 S.C. 608, 138 S.E.2d 42, 44 (1964) said:

... It is beside the point that the extent of damages might be difficult, *or even impossible, to establish prior to birth.* [Emphasis added.]

*Pehrson v. Kistner*, 301 Minn. 299, 222 N.W.2d 334, 337 (1974) said:

... Yet all verdicts attempting to compensate for the death of a minor child may be arbitrary attempts at a difficult, *if not impossible task....* [Emphasis added.]

To allow a recovery of special damages only, creates, in effect, a pyrrhic victory, a victory won at excessive cost. It is, in effect, a right without a remedy. All judges express sorrow at the tragic loss of an unborn child, but courts clothed with religious, philosophical and sentimental views cannot create a measure of damage where none exists. It can only be done when the measure of damage stated in U.J.I. 14.17 is abolished and the language of the wrongful death statute substituted therefor.

Under § 41–2–3:

... the jury ... may give such damages, compensatory and exemplary, as they shall deem fair and just, taking into consideration the pecuniary injury or injuries resulting from such death to the surviving party ... entitled to the judgment ....

An instruction given in this language would place the amount of an award in damages for the death of an unborn child within the discretion of the jury. It has been stated generally, except under wrongful death statutes, that where the jury is properly instructed, the amount to be awarded rests very largely within their discretion. *Guildner v. Gholston*, 472 P.2d 740 (Colo.App.1970); *Richards Company v. Harrison*, 262 So.2d 258 (Fla.App.1972); *Endress v. Brookdale Community College*, 144 N.J.Super. 109, 364 A.2d 1080 (1976); *Broesche v. Bullock*, 427 S.W.2d 89 (Tex.Civ. App.1968); *Rosen v. Lawson*, 281 Ala. 351,

**160**

202 So.2d 716 (1967); *Kerr v. Rollins*, 128 Vt. 507, 266 A.2d 804 (1970); *Kink v. Combs*, 28 Wis.2d 65, 135 N.W.2d 789 (1965).

Evidently, states which have allowed recovery for the negligent death of an unborn child will not allow a jury to "give such damages . . . as they shall deem fair and just." To do so, would allow the jury to exercise their religious, philosophical and sentimental views in arriving at the amount of the award. It is incongruous to hold that a viable fetus is a "person" on the one hand, and deny the representative of an unborn child the right to recover what the jury deems "fair and just" in an evaluation of the loss of the potential life. Otherwise viability has lost its value as a standard in prenatal tort law.

In my judgment, plaintiff will recover such damages as the jury may deem "fair and just" in her *personal* action. She seeks damages for physical pain and mental distress. Even though instructed not to award damages for the death of the unborn child, the natural and normal reaction of an ordinary member of a jury would result in compensation for the loss. In the field of damages, the amount to be awarded must be tempered with reality. To allow two rights of action may result in double recovery.

To discuss the other problems that arise would not assist in the solution of this new adventure in tort law.

Counts II and IV of plaintiff's complaint failed to state a claim upon which relief can be granted. The Judgment should be affirmed.